**MARTIN & BONNETT P.L.L.C.**
Susan Martin (AZ#014226)
Jennifer Kroll (AZ#019859)
4647 N. 32nd Street, Suite 185
Phoenix, Arizona 85018
Telephone: (602) 240-6900
Fax: (602) 240-2345
Email: smartin@martinbonnett.com
 jkroll@martinbonnett.com

**THE ROSEN LAW FIRM, P.A.**
Phillip Kim (*pro hac vice* application forthcoming)
Laurence M. Rosen (*pro hac vice* application forthcoming)
275 Madison Avenue, 40th Floor
New York, NY 10016
Telephone: (212) 686-1060
Email: philkim@rosenlegal.com
 lrosen@rosenlegal.com

*Attorneys for Plaintiff*

UNITED STATES DISTRICT COURT
DISTRICT OF ARIZONA

| | |
|---|---|
| Richard Reed, Individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>Freeport-McMoran Inc.; Kathleen L. Quirk; Richard C. Adkerson; and Maree E. Robertson,<br><br>Defendants. | No.<br><br>**CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**<br><br><u>CLASS ACTION</u><br><br>JURY TRIAL DEMANDED |

Plaintiff Richard Reed ("Plaintiff"), individually and on behalf of all other persons similarly situated, by Plaintiff's undersigned attorneys, for Plaintiff's complaint against Defendants (defined below), alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and information and belief as to all other matters, based upon, among other things, the investigation conducted by and through his attorneys, which included, among other things, a review of the Defendants' public documents, public filings, wire and press releases published by and regarding Freeport-McMoRan Inc. ("Freeport" or the "Company"), and information readily obtainable on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery. [1]

## NATURE OF THE ACTION

1. This is a class action on behalf of persons or entities who purchased or otherwise acquired publicly traded Freeport securities between February 15, 2022 and September 24, 2025, inclusive (the "Class Period"). Plaintiff seeks to recover compensable damages caused by Defendants' violations of the federal securities laws under the Securities Exchange Act of 1934 (the "Exchange Act").

## JURISDICTION AND VENUE

2. The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

---

[1] Unless otherwise stated, all emphasis is added and internal citations are omitted.

1

3.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331, and Section 27 of the Exchange Act (15 U.S.C. §78aa).

4.     Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b) and Section 27 of the Exchange Act (15 U.S.C. § 78aa(c)) as the alleged misstatements entered and the subsequent damages took place in this judicial district.

5.     In connection with the acts, conduct and other wrongs alleged in this complaint, Defendants (defined below), directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mails, interstate telephone communications and the facilities of the national securities exchange.

## PARTIES

6.     Plaintiff, as set forth in the accompanying certification, incorporated by reference herein, purchased Freeport securities during the Class Period and was economically damaged thereby.

7.     Freeport is a mining company. Pertinent to this action is a copper mine operated by Freeport in Papua, Indonesia, called the Grasberg Copper and Gold Mine ("Grasberg" or the "Grasberg Mine"), in which the Indonesian government holds a commercial interest.

8.     The Company is incorporated in Delaware and its principal executive offices are located at 333 North Central Avenue, Phoenix, Arizona 85004-2189.

9.     Freeport's common stock trades on the New York Stock Exchange (the "NYSE") under the ticker symbol "FCX."

CLASS ACTION COMPLAINT FOR VIOLATIONS OF
THE FEDERAL SECURITIES LAWS

10.     Defendant Kathleen L. Quirk ("Quirk") served as Freeport's Chief Executive Officer ("CEO") since June 11, 2024 and previously served as President and Chief Financial Officer ("CFO")

11.     Defendant Richard C. Adkerson ("Adkerson") served as CEO from the beginning of the Class Period until June 2024, and remains Chairman of the Board.

12.     Defendant Maree E. Robertson ("Robertson") has served as Freeport's Chief Financial Officer ("CFO") and Executive Vice President since March 1, 2022.

13.     Defendants Quirk, Adkerson, and Robertson are collectively referred to herein as the "Individual Defendants."

14.     Each of the Individual Defendants:

(a)     directly participated in the management of the Company;

(b)     was directly involved in the day-to-day operations of the Company at the highest levels;

(c)     was privy to confidential proprietary information concerning the Company and its business and operations;

(d)     was directly or indirectly involved in drafting, producing, reviewing and/or disseminating the false and misleading statements and information alleged herein;

(e)     was directly or indirectly involved in the oversight or implementation of the Company's internal controls;

(f)     was aware of or recklessly disregarded the fact that the false and misleading statements were being issued concerning the Company; and/or

3

CLASS ACTION COMPLAINT FOR VIOLATIONS OF
THE FEDERAL SECURITIES LAWS

(g)    approved or ratified these statements in violation of the federal securities

laws.

15.    The Company is liable for the acts of the Individual Defendants and its

employees under the doctrine of *respondeat superior* and common law principles of

agency because all of the wrongful acts complained of herein were carried out within the

scope of their employment.

16.    The scienter of the Individual Defendants and other employees and agents

of the Company is similarly imputed to Freeport under *respondeat superior* and agency

principles.

17.    Defendant Freeport and the Individual Defendants are collectively referred

to herein as "Defendants."

## SUBSTANTIVE ALLEGATIONS

### Materially False and Misleading Statements Issued During the Class Period

18.    On February 15, 2022, the Company filed with the SEC its Annual Report

on Form 10-K for the year ended December 31, 2021 (the "2021 Annual Report").

Attached to the 2021 Annual Report were signed certifications pursuant the Sarbanes-

Oxley Act of 2002 ("SOX") signed by Defendants Adkerson and Quirk attesting to the

accuracy of financial reporting, the disclosure of any material changes to the Company's

internal controls over financial reporting, and the disclosure of all fraud. [2]

---

[2] The risk disclosures discussed in this complaint were not updated in the amended 2021 10-K filed on February 18, 2022.

CLASS ACTION COMPLAINT FOR VIOLATIONS OF
THE FEDERAL SECURITIES LAWS

19.    The 2021 Annual Report contained the following risk disclosure which discussed, in pertinent part, risks regarding mining in Indonesia:

> ***Because our mining operations in Indonesia are a significant operating asset, our business may be adversely affected by political, economic and social uncertainties in Indonesia.***
>
> Maintaining a good working relationship with the Indonesia government and PT Indonesia Asahan Aluminium (Persero) (PT Inalum, also known as MIND ID), an Indonesia state-owned enterprise and shareholder in PT-FI, is important because of the significance of our Indonesia operations to our business, and because our mining operations there are among Indonesia's most significant business enterprises***. Partially because of the Grasberg minerals district's significance to Indonesia's economy, the environmentally sensitive area where it is located, and the number of people employed, our Indonesia operations have been the subject of political debates and criticism in the Indonesia press, and have been the target of protests and occasional violence. Improper management of our working relationship with the Indonesia government could lead to a disruption of operations and/or impact our reputation in Indonesia and in the region where we operate, which could adversely affect our business***.
>
> *    *    *
>
> We cannot assure you that future regulatory changes affecting the mining industry in Indonesia will not be introduced or unexpectedly repealed, or that new interpretations of existing laws and regulations will not be issued, which could adversely affect our business, financial condition and results of operations.

20.    The statement in ¶ 19 was materially false and misleading at the time it was made because it understated the risks of regulatory action in Indonesia harming the Company, given that it conducted unsafe mining practices at the Grasberg mine which were reasonably likely to result in worker deaths.

21.    The 2021 Annual Report contained the following statement about Freeport's purported commitment to safety:

> Our highest priority is the health, safety and well-being of our employees and contractors. We also instill health and safety processes for our suppliers and the

5

communities where we operate. We believe that health and safety considerations are integral to, and fundamental for, all other functions in our organization, and we understand that the health and safety of our workforce is critical to our operational efficiency and long-term success. Our global health and safety approach, "Safe Production Matters," is focused on fatality prevention and continuous improvement through the use of robust management systems, empowering safe work behaviors and strengthening our safety culture.

We focus on fatality prevention through the use of data and technology as well as behavioral science principles. Our framework for managing risks and compliance obligations is certified company wide in accordance with the new ISO 45001 Health and Safety Management System (ISO 45001), most recently certified in September 2021. ISO 45001 requires third-party site-level verification of requirements, with a goal to prevent fatalities and reduce safety incidents.

As part of our commitment to providing a safe and healthy workplace, we strive to provide the training, tools and resources needed so our workforce can identify risks and consistently apply effective controls. We share information and key learnings about potentially fatal events, near misses and best practices throughout the company and engage with industry peers outside the organization to continuously improve our health and safety performance. We also review and discuss all fatalities with the Corporate Responsibility Committee and the Board.

Our objective is to achieve zero workplace fatalities and to decrease injuries and occupational illnesses. We measure our safety performance through regularly established benchmarks, including our company-wide Total Recordable Incident Rate (TRIR), which includes both employees and contractors. In 2021, regrettably, we had 3 workplace fatal events, 2 work related and 1 not yet classified as either an independent medical episode or work related, and 17 potential fatal events (PFEs), compared to 5 fatalities and 12 PFEs in 2020. Overall, the percentage of high risk incidents has trended down from 11 percent in 2019 to 7 percent in 2020 and 2021. Our TRIR per 200,000 man-hours worked was 0.69 in both 2021 and 2020, meeting our 2021 and 2020 targets. The metal mining sector industry average per 200,000 man-hours worked reported by MSHA was 1.70 for 2021 (preliminary for the period of January 1, 2021, through September 30, 2021) and 1.66 in 2020.

22.    The statement in ¶ 21 was materially false and misleading because it

overstated Freeport's commitment to safety, given unsafe practices in Indonesia which

Defendants knew or should have known could lead to worker deaths in Indonesia, which

would trigger heightened regulatory scrutiny in the Indonesian government and put Freeport's future business prospects at material risk of harm.

23.    On February 15, 2023, the Company filed with the SEC its Annual Report on Form 10-K for the year ended December 31, 2022 (the "2022 Annual Report"). Attached to the 2022 Annual Report were signed certifications pursuant SOX signed by Defendants Adkerson and Robertson attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal controls over financial reporting, and the disclosure of all fraud.

24.    The 2022 Annual Report contained a substantially similar risk disclosure as the one contained in ¶ 19.

25.    As such, it was materially false and misleading when made for the reasons stated in ¶ 20.

26.    The 2022 Annual Report contained a substantially similar statement as the one contained in ¶ 21.

27.    As such, the statement in ¶ 21 was materially false and misleading for the reasons stated in ¶ 22.

28.    On February 16, 2024, the Company filed with the SEC its Annual Report on Form 10-K for the year ended December 31, 2023 (the "2023 Annual Report"). Attached to the 2023 Annual Report were signed certifications pursuant to SOX signed by Defendants Adkerson and Robertson attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal controls over financial reporting, and the disclosure of all fraud.

29.     The 2023 Annual Report contained a substantially similar risk disclosure as the one contained in ¶ 19.

30.     As such, it was materially false and misleading when made for the reasons stated in ¶ 20.

31.     The 2023 Annual Report contained a substantially similar statement regarding Freeport's purported commitment to safety as the one contained in ¶ 21.

32.     As such, it was materially false and misleading for the reasons stated in ¶ 22.

33.     On February 15, 2025, the Company filed with the SEC its Annual Report on Form 10-K for the year ended December 31, 2024 (the "2024 Annual Report"). Attached to the 2024 Annual Report were signed certifications pursuant to SOX signed by Defendants Adkerson and Robertson attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal controls over financial reporting, and the disclosure of all fraud.

34.     The 2024 Annual Report contained a substantially similar risk disclosure as the one contained in ¶ 19.

35.     As such, it was materially false and misleading when made for the reasons stated in ¶ 20.

36.     The 2024 Annual Report contained a substantially similar statement regarding Freeport's purported commitment to safety as the one contained in ¶ 21.

37.     As such, it was materially false and misleading for the reasons stated in ¶ 22.

CLASS ACTION COMPLAINT FOR VIOLATIONS OF
THE FEDERAL SECURITIES LAWS

38.    The statements contained in ¶¶ 19, 21, 24, 26, 29, 31, 34, and 36 were materially false and/or misleading because they misrepresented and failed to disclose the following adverse facts pertaining to the Company's business, operations and prospects, which were known to Defendants or recklessly disregarded by them. Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (1) Freeport did not adequately ensure safety at the Grasberg Block Cave mine in Indonesia; (2) the lack of proper safety precautions constituted a heightened risk that could foreseeably lead to the death of Freeport's workers; (3) this constituted an undisclosed heightened risk of regulatory, litigation, and reputational risk; and (4) as a result, Defendants' statements about Freeport-MoMoRan's business, operations, and prospects were materially false and misleading and/or lacked a reasonable basis at all relevant times.

## **THE TRUTH BEGINS TO EMERGE**

39.    On September 9, 2025, Freeport issued a press release entitled "Freeport Reports on PT Freeport Indonesia Operations." The release stated the following:

> [Freeport announces] that on [September 8] in Central Papua, Indonesia, a large flow of wet material from a production drawpoint occurred at one of five production blocks in the Grasberg Block Cave underground mine. The incident blocked access to certain areas within the mine, restricting evacuation routes for seven team members.

> The location of the workers is known, and they are believed to be safe. Crews are working to clear the area for a safe and expeditious evacuation. In parallel, activities are underway to provide support to the workers.

> At the Grasberg Block Cave operation, ore is mined using remotely operated equipment; however, the material flow from this event blocked access routes

9

CLASS ACTION COMPLAINT FOR VIOLATIONS OF
THE FEDERAL SECURITIES LAWS

where the affected team members were engaged in mine development activities. All other personnel are confirmed safe.

***Mining operations in the Grasberg minerals district have been temporarily suspended to prioritize the safe evacuation of the seven contractor workers***.

40.     On this news, the price of Freeport stock fell $2.77 per share, or 5.9%, to close at $43.89 on September 9, 2025.

41.     Then, on September 24, 2025, Freeport issued another press release discussing the same safety incident at Grasberg. It stated the following:

Freeport [announces today] an update on the status of the previously reported mud rush incident at the Grasberg Block Cave mine (GBC) in Indonesia.

On September 20, 2025, PT Freeport Indonesia (PTFI) located two team members who were regrettably fatally injured in the September 8th incident. The Freeport organization extends its deepest condolences to the families of these individuals.

***Extensive efforts are ongoing in the search for five PTFI team members who remain missing. Teams are working around the clock clearing mud and debris and are making steady progress to reach the areas where the remaining team members were working at the time of the incident***. These efforts remain our highest priority.

*       *       *

During the incident, a sudden rush of approximately 800,000 metric tons of wet material entered the mine and traveled rapidly to multiple mine levels, including the service level of the mine where the missing team members were conducting development activities.

***To prioritize the search, mining operations in the Grasberg minerals district have been temporarily suspended since September 8th, as previously reported***.

PTFI has commenced an investigation to identify the cause of this incident, which is unprecedented in PTFI's multi-decade history of block cave mining operations. The investigation team includes external experts and will address root cause analysis and recommendations to safeguard against future occurrences. PTFI expects the investigation to be completed by year-end 2025.

10

PTFI is working closely with Indonesian government authorities who are reviewing the incident and monitoring the search operations.

42.    In the same press release, the Company gave investors guidance on the business impact of the tragic accident at Grasberg, stating the following about third quarter sales guidance:

For the third quarter of 2025, FCX's consolidated sales *are expected to be 4% lower for copper and approximately 6% lower for gold than July 2025 estimates.*

43.    The same release stated the following about future production:

*The GBC ore body represents 50% of PTFI's estimated proven and probable reserves as of December 31, 2024, and approximately 70% of PTFI's previously forecast copper and gold production through 2029.* The incident occurred in "PB1C", one of five production blocks in the GBC but resulted in damage to infrastructure required to support other production areas in the GBC.

*PTFI is evaluating the impact of the incident on future production plans. Production forecasts will be revised to incorporate scheduling of required repairs and a phased restart and ramp-up of production.*

Sufficient information is not currently available to forecast future production estimates. Preliminary assessments indicate that the impacts are likely to result in the deferral of significant production in the near-term (fourth quarter of 2025 and the year 2026) as repairs are completed and a phased restart and ramp-up of operations commences. *A return to pre-incident operating rates could potentially be achieved in 2027.*

Currently, PTFI expects the unaffected Big Gossan and Deep MLZ mines could restart operations by mid-fourth quarter 2025, with a phased restart and ramp-up of the GBC mine beginning in the first half of 2026. As a result, PTFI fourth quarter 2025 sales of copper and gold would be insignificant (previously estimated sales of 445 million pounds of copper and 345,000 ounces of gold).

In the first half of 2026, a phased restart and ramp-up of GBC could, initially commence in three production blocks - "PB2" and "PB3", followed by a third production block "PB1S" in the second half of 2026 and the balance of "PB1C" in 2027. This schedule would target the return to pre-incident estimates in 2027.

11

CLASS ACTION COMPLAINT FOR VIOLATIONS OF
THE FEDERAL SECURITIES LAWS

*Under this phased restart and ramp-up scenario, which is subject to a number of factors and could change, PTFI production in 2026 could potentially be approximately 35% lower than pre-incident estimates (previous production estimates for 2026 approximated 1.7 billion pounds of copper and 1.6 million ounces of gold).*

PTFI will seek to optimize production plans as further evaluations are completed. Capital projects will be reviewed and managed to prioritize resources necessary to support restoration of safe production.

PTFI intends to seek recovery of damages under its property and business interruption insurance policies, which cover up to $1.0 billion in losses (subject to a limit of $0.7 billion on underground incidents), after a $0.5 billion deductible.

*As a result of the incident and impacts on operations, PTFI is notifying commercial counterparties of a force majeure in accordance with the provisions of its contracts*.

44.     On this news, the price of Freeport stock fell $7.69 per share, or 16.95%, to close at $37.67 on September 24, 2025.

45.     On September 25, 2025, before the market opened, Bloomberg published an article entitled "Freeport Mine Setback Risks Fraying Relations With Indonesia." It stated, in pertinent part, the following:

*A halt in production at the giant Grasberg copper mine in Indonesia looks set to strain the fractious relationship between [Freeport] and its host nation*, at a time when the Jakarta government *was already looking to take greater control*.

Freeport declared force majeure on contracted supplies on Wednesday, two weeks after about 800,000 tons of mud flooded underground tunnels. Two workers were killed, while five more remain missing. The US-listed company slashed its production guidance, dragging its shares down 17% and pushing copper futures to the highest level in more than a year.

Grasberg has long been a flashpoint as Jakarta tries to gain a greater say over its resources. The state controls 51% of the local entity – after a lengthy battle over ownership – *but officials have sporadically continued to demand an increased share. That clamor may now intensify*.

12

*The accident also comes at a challenging time for President Prabowo Subianto*, who took office last year and has faced violent street protests, as well as a struggle to fund his costly plans for Southeast Asia's largest economy.

\*    \*    \*

*Prabowo's government has vowed to curb excesses in the mining sector*, and both foreign and local operators have had to contend with higher royalty payments and crackdowns on permit infractions.

46.    On this news, Freeport stock fell $2.33 per share, or 6.18%, to close at $35.34 on September 25, 2025.

47.    On September 28, 2025, after the Class Period, Tempo (a news organization focusing on Indonesia), published an article entitled "Freeport Landslide was Preventable, Not Just a Natural Disaster, Says Expert."

48.    The article stated the following:

A professor from the Faculty of Public Health at the University of Indonesia (UI), Fatma Lestari, asserted that the recent landslide at the Freeport Indonesia mine was not merely a natural disaster. *She explained that the landslide, often termed a mud rush, is a known flow of mud and rocks from the mine cavity, a risk long associated with certain mining methods.*

49.    The article quoted the professor as saying "[*i]n other words, this danger is not new and should have been anticipated from the beginning*[.]"

50.    As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's common shares, Plaintiff and other Class members have suffered significant losses and damages.

## PLAINTIFF'S CLASS ACTION ALLEGATIONS

51.    Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class consisting of all persons other than

13

defendants who acquired the Company's securities publicly traded on NYSE during the Class Period, and who were damaged thereby (the "Class"). Excluded from the Class are Defendants, the officers and directors of the Company, members of the Individual Defendants' immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

52.    The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, the Company's securities were actively traded on NYSE. While the exact number of Class members is unknown to Plaintiff at this time and can be ascertained only through appropriate discovery, Plaintiff believes that there are hundreds, if not thousands of members in the proposed Class.

53.    Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

54.    Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Plaintiff has no interests antagonistic to or in conflict with those of the Class.

55.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

- whether the Exchange Act was violated by Defendants' acts as alleged herein;

CLASS ACTION COMPLAINT FOR VIOLATIONS OF
THE FEDERAL SECURITIES LAWS

- whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business and financial condition of the Company;

- whether Defendants' public statements to the investing public during the Class Period omitted material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading;

- whether the Defendants caused the Company to issue false and misleading filings during the Class Period;

- whether Defendants acted knowingly or recklessly in issuing false filings;

- whether the prices of the Company securities during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and

- whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

56.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

57.    Plaintiff will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

CLASS ACTION COMPLAINT FOR VIOLATIONS OF
THE FEDERAL SECURITIES LAWS

- the Company's shares met the requirements for listing, and were listed and actively traded on NYSE, an efficient market;

- as a public issuer, the Company filed periodic public reports;

- the Company regularly communicated with public investors via established market communication mechanisms, including through the regular dissemination of press releases via major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services;

- the Company's securities were liquid and traded with moderate to heavy volume during the Class Period; and

- the Company was followed by a number of securities analysts employed by major brokerage firms who wrote reports that were widely distributed and publicly available.

58.     Based on the foregoing, the market for the Company's securities promptly digested current information regarding the Company from all publicly available sources and reflected such information in the prices of the shares, and Plaintiff and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

59.     Alternatively, Plaintiff and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128 (1972), as Defendants omitted material

CLASS ACTION COMPLAINT FOR VIOLATIONS OF
THE FEDERAL SECURITIES LAWS

information in their Class Period statements in violation of a duty to disclose such information as detailed above.

## COUNT I

### For Violations of Section 10(b) And Rule 10b-5 Promulgated Thereunder

### Against All Defendants

60.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

61.     This Count is asserted against Defendants is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

62.     During the Class Period, Defendants, individually and in concert, directly or indirectly, disseminated or approved the false statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

63.     Defendants violated §10(b) of the 1934 Act and Rule 10b-5 in that they:

• employed devices, schemes and artifices to defraud;

• made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

CLASS ACTION COMPLAINT FOR VIOLATIONS OF
THE FEDERAL SECURITIES LAWS

- engaged in acts, practices and a course of business that operated as a fraud or deceit upon plaintiff and others similarly situated in connection with their purchases of the Company's securities during the Class Period.

64.    Defendants acted with scienter in that they knew that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated, or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the securities laws. These defendants by virtue of their receipt of information reflecting the true facts of the Company, their control over, and/or receipt and/or modification of the Company's allegedly materially misleading statements, and/or their associations with the Company which made them privy to confidential proprietary information concerning the Company, participated in the fraudulent scheme alleged herein.

65.    Individual Defendants, who are the senior officers of the Company, had actual knowledge of the material omissions and/or the falsity of the material statements set forth above, and intended to deceive Plaintiff and the other members of the Class, or, in the alternative, acted with reckless disregard for the truth when they failed to ascertain and disclose the true facts in the statements made by them or any other of the Company's personnel to members of the investing public, including Plaintiff and the Class.

66.    As a result of the foregoing, the market price of the Company's securities was artificially inflated during the Class Period. In ignorance of the falsity of Defendants' statements, Plaintiff and the other members of the Class relied on the statements

18

described above and/or the integrity of the market price of the Company's securities during the Class Period in purchasing the Company's securities at prices that were artificially inflated as a result of Defendants' false and misleading statements.

67.    Had Plaintiff and the other members of the Class been aware that the market price of the Company's securities had been artificially and falsely inflated by Defendants' misleading statements and by the material adverse information which Defendants did not disclose, they would not have purchased the Company's securities at the artificially inflated prices that they did, or at all.

68.    As a result of the wrongful conduct alleged herein, Plaintiff and other members of the Class have suffered damages in an amount to be established at trial.

69.    By reason of the foregoing, Defendants have violated Section 10(b) of the 1934 Act and Rule 10b-5 promulgated thereunder and are liable to the plaintiff and the other members of the Class for substantial damages which they suffered in connection with their purchase of the Company's securities during the Class Period.

## COUNT II

### Violations of Section 20(a) of the Exchange Act

### Against the Individual Defendants

70.    Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

71.    During the Class Period, the Individual Defendants participated in the operation and management of the Company, and conducted and participated, directly and indirectly, in the conduct of the Company's business affairs. Because of their senior

19

positions, they knew the adverse non-public information about the Company's business practices.

72.    As officers of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to the Company's' financial condition and results of operations, and to correct promptly any public statements issued by the Company which had become materially false or misleading.

73.    Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which the Company disseminated in the marketplace during the Class Period concerning the Company's results of operations. Throughout the Class Period, the Individual Defendants exercised their power and authority to cause the Company to engage in the wrongful acts complained of herein. The Individual Defendants therefore, were "controlling persons" of the Company within the meaning of Section 20(a) of the Exchange Act. In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of the Company's securities.

74.    By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by the Company.

### **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff, on behalf of himself and the Class, prays for judgment and relief as follows:

20

(a)    declaring this action to be a proper class action, designating Plaintiff as Lead Plaintiff and certifying Plaintiff as a class representative under Rule 23 of the Federal Rules of Civil Procedure and designating Plaintiff's counsel as Lead Counsel;

(b)    awarding damages in favor of Plaintiff and the other Class members against all Defendants, jointly and severally, together with interest thereon;

(c)    awarding Plaintiff and the Class reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

(d)    awarding Plaintiff and other members of the Class such other and further relief as the Court may deem just and proper.

## <u>JURY TRIAL DEMANDED</u>

Plaintiff hereby demands a trial by jury.

Dated: November 12, 2025

**MARTIN & BONNET P.L.L.C.**
<u>s/ Susan Martin</u>
Susan Martin
Jennifer Kroll
4647 N. 32nd Street, Suite 185
Phoenix, Arizona 85018
Phone: 602-240-6900
Fax: 602-240-2345
Email: smartin@martinbonnett.com
jkroll@martinbonnett.com

**THE ROSEN LAW FIRM, P.A.**
Phillip Kim
(*pro hac vice* application forthcoming)
Laurence M. Rosen
(*pro hac vice* application forthcoming)
275 Madison Avenue, 40th Floor

21

New York, NY 10016
Telephone: (212) 686-1060
Email: philkim@rosenlegal.com
lrosen@rosenlegal.com

*Attorneys for Plaintiff*

22

## Certification and Authorization of Named Plaintiff Pursuant to Federal Securities Laws

The individual or institution listed below (the "Plaintiff") authorizes and, upon execution of the accompanying retainer agreement by The Rosen Law Firm P.A., retains The Rosen Law Firm P.A. to file an action under the federal securities laws to recover damages and to seek other relief against Freeport-McMoRan Inc. The Rosen Law Firm P.A. will prosecute the action on a contingent fee basis not to exceed one-third of the recovery and will advance all costs and expenses. All payments of fees and expenses shall be made only after Court review and approval. The Freeport-McMoRan Inc. Retention Agreement provided to the Plaintiff is incorporated by reference herein and is effective, upon execution and delivery by The Rosen Law Firm P.A.

| | |
|---|---|
| **First Name:** | Richard |
| **Middle Initial:** | |
| **Last Name:** | Reed |
| **Mailing Address:** | Redacted. |
| **City:** | |
| **State:** | |
| **Zip Code:** | |
| **Country:** | |
| **Phone:** | |
| **Email Address:** | |

Plaintiff certifies that:

1. Plaintiff has reviewed a complaint and authorized its filing or the filing of an amended complaint.
2. Plaintiff did not acquire the security that is the subject of this action at the direction of plaintiff's counsel or in order to participate in this private action or any other litigation under the federal securities laws.
3. Plaintiff is willing to serve as a representative party on behalf of a class, including providing testimony at deposition and trial, if necessary.
4. Plaintiff represents and warrants that he/she/it is fully authorized to enter into and execute this certification.
5. Plaintiff will not accept any payment for serving as a representative party on behalf of the class beyond Plaintiff's pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the class as ordered or approved by the court.
6. Plaintiff has made no transaction(s) during the Class Period in the debt or equity securities that are the subject of this action except those set forth below:

**Purchases:**

| Type of Security | Buy Date | no of Shares | Price per Share |
|---|---|---|---|
| Common Stock | 08/18/2025 | 240 | $41.7650 |
| Type of Security | | | |
| Type of Security | | | |

**Sales:**

| Type of Security | Sale Date | no of Shares | Price per Share |
|---|---|---|---|

Common Stock

**I have not sought to serve as a representative party on behalf of a class under the federal securities laws during the last three years, except if set forth below.**
Not applicable

I declare and certify under penalty of perjury, under the laws of the United States   **YES**
of America, that the foregoing information is true and correct.

By Signing below and submitting this certification form electronically, I intend to   **YES**
sign and execute this certification pursuant to California Civil Code Section
1633.1, et seq. - and the Uniform Electronic Transactions Act and retain the
Rosen Law Firm, P.A. to proceed on Plaintiff's behalf, on a contingent fee basis.

Date of signing: 11/06/2025 06:06:58 at Eastern Standard Time, USA

